UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| SARAH M.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL NO. 3:19cv1150 |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Disability
Insurance Benefits (DIB) as provided for in the Social Security Act.  Section 205(g) of the Act
provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the
transcript of the record including the evidence upon which the findings and decision complained
of are based.  The court shall have the power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or
without remanding the case for a rehearing."  It also provides, "[t]he findings of the
[Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42
U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to
engage in any substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to last for a continuous period of no less than 12

---

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

is "an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must

be shown that the impairment is severe enough to preclude the plaintiff from engaging in

substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372

U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established

that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See*

*Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir.

1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record

as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v.*

*Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786

(7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*,

552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed,

42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also*

*Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law

Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2018. (Ex. 3D)

2.      The claimant has not engaged in sustantial gainful activity since May 9, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*)

3.      The claimant has the following severe impairments: chronic headache, psuedotumor cerebri history, bipolar disorder, and anxiety (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: can tolerate frequent exposure to extreme heat and cold, humidity, fumes, odors, dusts, gases, and poor ventilation; can carry out simple instructions and routine and repetitive tasks; cannot perform work requiring a specific production rate such as assembly line work; can maintain attention for concentration for two-hour intervals; could respond appropriately to occasional changes in the workplace; could have frequent interactions with supervisors apart from what is necessary for general instruction, task completion, or training; and could have frequent interactions with coworkers and the general public.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on July 28, 1981 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 403.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 9, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12- 21 ).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff  filed her opening brief on May 18, 2020.  On July 27, 2020 the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on August 8, 2020.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"? (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).  From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

Plaintiff sought treatment with Timothy McFadden, M.D., at Oaklawn Psychiatric Center, since at least August 2011. (Tr. 435.) At the time, Dr. McFadden diagnosed her with bipolar disorder I, most recent episode mixed, severe, without psychotic features, and assigned her a Global Assessment of Functioning (GAF) score of 55, representing moderate symptoms or moderate difficulty in functioning. (Tr. 438.) On January 21, 2013, Dr. McFadden noted a call from Plaintiff requesting an earlier appointment; she was involved in an auto accident, hit a pedestrian, had acute anxiety, and had been unable to work since. (Tr. 425.) Plaintiff described "great anxiety," periodic panic attacks, occasional flashbacks, and inability to drive; she had feelings of guilt, low mood and tearfulness. (*Id*.) On exam, she was tearful and somewhat anxious. (*Id*.) Dr. McFadden increased Abilify and Xanax and referred her to individual therapy. (Tr. 426.)

Plaintiff's treatment at IU Goshen Physicians began in June 2012, when she was treated for moderate headaches by Jody Neer, M.D. (Tr. 516.) In 2012, she had a CT of the head, which was negative (Tr. 592), and an MRI of the brain, which showed small, non-specific T2/FLAIR hyperintense focus in the subcortical white matter in the inferior right frontal lobe entirely nonspecific (Tr. 590). There were several diagnostic considerations, including migraines, autoimmune or demyelinating process. (*Id*.) She also had a spinal tap on July 12, 2012, with a pre- and post-surgical diagnosis of headache. (Tr. 587.) On January 29, 2013, Plaintiff sought care at IU Goshen for "pseudo tumor cerebri and headache." (Tr. 512.) She reported an "increase in headache due to PTSD from a MVA," occurring once or twice a week, and requiring her to use "5-6 Indomethacin a week." (*Id*.) She suffered anxiety, difficulty concentrating, headache, insomnia, and mood swings. (Tr. 513.) Plaintiff weighed 262 pounds, for a body mass index (BMI) of 39.83. (*Id*.) The neurological exam was unremarkable (*id*.), and Beth Gladfelter, Nurse

5

Practitioner (NP), assessed pseudotumor cerebri, headache, papilledema, NOS, and bipolar disorder; Plaintiff's medications were adjusted. (Tr. 514.)

Yatin J. Patel, M.D., is Board certified in Pulmonary and Sleep Medicine, and began seeing Plaintiff in October 2012; he requested she complete the Epworth Sleepiness Scale (ESS). (Tr. 377-95.) In 2012, she scored a 7 on the ESS; in 2013, she scored an 8, 7, and 12. (Tr. 379-82.) In 2013, Plaintiff complained of daytime fatigue. (Tr. 388, 393.) Her weight ranged from 262 to 270 pounds, a BMI of 38.69 to 39.87. (Tr. 389, 393.) Dr. Patel diagnosed hypersomnia. (Tr. 388, 393.)

At the follow up at IU Goshen on July 29, 2013, Plaintiff reported "a couple of migraines per month and a few headaches per week"; she was sleeping more due to depression. (Tr. 509.) Her BMI increased to 40.14 (Tr. 510), and NP Gladfelter noted that she was still gaining weight and they discussed "how this can affect the psuedotumor" [sic] (Tr. 511). She added Topamax. (*Id*.)

Although Dr. McFadden had planned to see Plaintiff in one month (Tr. 426), the next progress note is dated January 3, 2014. (Tr. 418.) She reported being "very stressed;" she weighed 280 pounds, for a BMI of 41.34. (Tr. 419.) Plaintiff was attending individual therapy and felt she was making some progress. (*Id*.) Dr. McFadden continued her medications. (Tr. 420.) When Plaintiff returned to Dr. Neer on January 16, 2014,6 she noted a "new daily-type of headache," without triggering or relieving factors. (Tr. 476.) Dr. Neer reviewed the 2012 MRI and lumbar puncture results, found the pseudotumor cerebri well-controlled, but added Tramadol, Norethindrone, Synthroid, and Promethazine for headaches. (Tr. 477-78.)

On May 27, 2014, Plaintiff was evaluated at the IU Goshen Hospital's Center for Medical

6

Nutrition Therapy for "a diagnosis of Obesity" with a complex past medical history. (Tr. 576.) She weighed 269.5 pounds, for a BMI of 41.6. (*Id*.) While she had a "good understanding of basic nutrition and basic weight loss strategies," she "has experienced a prolonged depressive episode since a year ago, which has made it difficult to adopt healthier lifestyle habits." (Tr. 577.) She received comprehensive nutrition education. (*Id.*)

Plaintiff participated in physical therapy at IU Health Rehabilitation Services in June 2014. (Tr. 335-72.) The records reflect treatment for lateral ligament instability of both ankles, muscle wasting, and pain ankle/foot. (Tr. 337, 343, 349.) These conditions affected her walking and climbing stairs. (Tr. 343, 345.) She had bilateral lateral ankle ligament tenderness (Tr. 344); she was compliant with treatment, which resulted in improvement (Tr. 338, 350, 361).

At the July 15, 2014 visit with NP Gladfelter at IU Goshen, Plaintiff stated she experienced headaches "3 days a week," lasting a "few hours," and they were of moderate severity. (Tr. 505.) The headaches were exacerbated by stress and were worse in her depressive episodes; medication, sleep, and a quiet, dark room alleviated them. (*Id*.) The neurological exam was normal; her BMI was 39.34. (Tr. 507.) Ms. Gladfelter assessed the pseudotumor cerebri as stable, and added headache, occurring three times a week; all medications were continued. (*Id*.) At three additional visits in 2014, Plaintiff continued to report having headaches three times a week, lasting a few hours, of moderate severity. (Tr. 493, 498, 500.) She complained of fatigue as well as several other symptoms. (Tr. 491, 495, 503.) Her medications were increased, and new ones added. (*Id*.) Her lowest BMI at IU Goshen for the remainder of 2014 was 38.30. (Tr. 492.)

On August 24, 2014, Plaintiff returned to the ER complaining of "a headache since Monday"; she reported headaches occurring twice a week and getting worse. (Tr. 373.) Her past

medical history included, among others, pseudotumurous cerebri, chronic headaches, bipolar disorder and anxiety; she was taking several medications for these and other conditions. (*Id*.) She was examined in a dark room (Tr. 374.) A CT of the head was negative for hydrocephalus; she received Dilaudid and Phenergan intramuscularly. (*Id*.) The primary diagnosis was acute exacerbation of chronic headache; others were bipolar and anxiety disorders. (*Id*.)

Plaintiff established care with David C. Kay, M.D., Goshen Internal Medicine, on November 13, 2014, for evaluation of hypothyroidism (status post thyroidectomy), diabetes (managed on oral medications), and weight management (difficult due to depression). (Tr. 450.) She complained of "fatigue, lethargy" and headaches; she weighed 265 pounds for a BMI of 39.42. (Tr. 452.) Dr. Kay diagnosed hypothyroidism and ordered laboratory tests. (Tr. 453.) On November 25, 2014, Plaintiff returned to Dr. McFadden, who noted she had been treated from January 2013 to February 26, 2014. (Tr. 401.) She decided to "take a break from therapy" at Oaklawn; she planned on seeing a therapist in the community and continuing psychiatric treatment with Dr. McFadden. (*Id*.) Dr. McFadden stated that Plaintiff "had made a number of changes, but she seemed not to be able to feel less depressed or make significant changes in her anxiety." (Tr. 401.)

At the next session on February 9, 2015, Dr. McFadden noted that Plaintiff was attending individual therapy with Katharine Schrock. (Tr. 412.) She "struggled chronically with low mood and low motivation"; she continued to isolate, sleep a lot, and "have a lot of fatigue." (*Id*.) Plaintiff felt that "her mood remains on a roller coaster." (*Id*.) On exam, her affect was blunted, and her mood was low. (Tr. 412-13.) Her thought content centered around "her ongoing depression symptoms" and she was "[f]rustrated by her lack of energy." (Tr. 413.) Her Lithium was

8

increased. (*Id*.)

When Plaintiff returned to Dr. Patel in February 2015, she reported "a lot of stress related headaches," and complained of excessive daytime sleepiness, tiredness, and fatigue. (Tr. 383.) She weighed 259 pounds, a BMI of 38.24; her ESS score was 11 in 2014, and 13 in 2015. (Tr. 383-84, 387.) Her primary diagnosis of hypersomnia was confirmed. (*Id*.)

On May 1, 2015, Plaintiff followed up with Dr. Kay about worsening hypothyroidism symptoms, including increased perspiration, heat intolerance, and rapid heartbeat. (Tr. 447.) She was told to take medicine more consistently and repeat laboratory tests in two months. (Tr. 449.) Plaintiff returned to Dr. McFadden on August 14, 2015, reporting that "she lost her motivation," and "her feelings were numb." (Tr. 405.) She was isolated socially and spent most of her time in bed reading; she even skipped her hygiene most days and stopped attending therapy. (*Id*.) However, she was taking most medications consistently. (*Id*.) Plaintiff reported low energy and increased sleep. (Tr. 405.) On exam, she had a blunted affect. (*Id*.) Dr. McFadden prescribed Rexulti and continued all other medications. (Tr. 406.)

On August 31, 2015, Plaintiff saw Jason Moshier, M.D., also at Goshen, for worsening left knee pain rated as 8/10 in severity. (Tr. 444.) Plaintiff weighed 246 pounds; she had mild effusion and worse pain with knee flexion. (Tr. 445-46.) Dr. Moshier diagnosed left knee pain, most likely due to patellar tendonitis. (*Id*.) He prescribed a knee brace, rest, ice and heat, and continued use of Indomethacin, a nonsteroidal anti-inflammatory. (*Id*.)

Plaintiff followed up with either Dr. Neer or Ms. Gladfelter at IU Goshen in January, May and September 2015. (Tr. 479, 484, 489.) In January, she reported headaches due to weather and bipolar depression; Dr. Neer noted "[s]he is having another big bout of depression and anxiety."

(Tr. 490.) She complained of fatigue and other symptoms. (Tr. 491.) Plaintiff's May visit with Dr. Neer revealed she was having "2 migraines a week – Stress HA's (headaches) daily. Having depression issues right now." (Tr. 488.) She was started on Arimidex, Xyzal, Nuvigil, and Singulair. (Tr. 484.) However, Plaintiff continued to complain of fatigue at the September appointment with Ms. Gladfelter (Tr. 481) and was "having more headaches with more PTSD flash backs" (Tr. 480). She had "1-2 migraines a week with 4-5 stress headaches." (*Id.*) The multi-medication regimen continued. (*Id.*)

On September 30, 2015, Plaintiff followed up at the Sneeze and Snooze Clinic; on this visit she saw Deborah Ponce, NP-C. (Tr. 599.) Plaintiff complained of daytime fatigue and headaches "all the time." (*Id.*) Her ESS score was 13; she only drove locally. (*Id.*) Ms. Ponce assessed hypersomnia, rhinitis and postnasal drip. (*Id.*)

Dr. Kay saw Plaintiff on November 5, 2015, for headache and hypothyroidism. (Tr. 702.) Her BMI was 37.21; the physical exam was normal. (Tr. 704.) Dr. Kay diagnosed hypothyroidism (TSH to be scheduled), vascular headache (treat symptomatically), and dietary counseling and surveillance (education regarding diet). (Tr. 705.)

On November 30, 2015, Plaintiff saw Dr. Neer for daily headache, pressure type; the pseudotumor headaches made her feel her head would explode due to pressure. (Tr. 670.) She wanted to check the cerebrospinal fluid pressure. (*Id.*) Among others, she complained of fatigue, memory impairment and tremors. (Tr. 674.) She weighed 248 pounds for a BMI of 36.62. (*Id.*) Dr. Neer diagnosed intractable migraine without aura and without status migrainosus, worse, and ordered testing. (Tr. 675.) A CT of the head was negative on December 8, 2015. (Tr. 570.) Also on that date, a lumbar spinal puncture revealed an opening pressure of 20 cm. and closing pressure

10

of 12 cm. (Tr. 572.) The pathology of the fluid was negative for malignancy and showed scattered lymphocytes present. (Tr. 585.) Diagnosis was benign intracranial hypertension. (Tr. 573.)

On December 18, 2015, Plaintiff saw Dr. McFadden, reporting that her mood was "somewhat better with Rexulti," but she was "feeling lots of anxiety." (Tr. 637.) She described "more issues regarding PTSD and her history of sexual abuse." (*Id*.) Plaintiff could not afford her private therapist due to the co-pay and wanted to return to Oaklawn for therapy. (*Id*.) Her energy "remain[ed] low" and she had headaches. (*Id*.) Dr. McFadden noted that "thought content center[ed] around her feelings of anxiety and also questions about PTSD." (*Id*.) Dr. McFadden increased Rexulti, continued other medications, and referred her for therapy. (Tr. 638.)

Catherine Herzog, an LCSW at Oaklawn, prepared an Initial Plan of Care on February 10, 2016, co-signed by Dr. McFadden. (Tr. 650, 652.) Plaintiff reported "struggling with her mood and having severe panic attacks." (Tr. 651.) Ms. Herzog planned to provide individual therapy to "manage symptoms of panic." (*Id*.) Dr. McFadden, along with nursing staff, would continue to provide medication evaluation, monitoring and follow-up. (Tr. 652.)

Dr. McFadden saw Plaintiff on March 29, 2016, at which time she reported that Prasozin, prescribed at her last appointment, provided "partial improvement;" she still had anxiety attacks from triggers during the day and nightmares, but the intensity had decreased. (Tr. 631.) Energy still was low. (*Id*.) Dr. McFadden increased Prasozin, and continued other medications prescribed by him and Drs. Neer and Kay. (Tr. 632.)

Plaintiff returned to Dr. Neer on April 18, 2016, reporting worsening headaches occurring 5 days a week, lasting up to 12 hours, and aggravated by stress, light, and sounds. (Tr. 665.) Dr. Neer noted the results of recent tests (*id*.) and diagnosed pseudotumor cerebri, stable, and

11

intractable migraine without aura and without status migrainosus, poorly-controlled (Tr. 668). Preventative, abortive and rescue medications were continued. (*Id*.)

A review of her care plan at Oaklawn in May 2016, showed Plaintiff was "fairly consistent with therapy" and completed assignments; a few times she cancelled visits due to illness or other conflicts. (Tr. 647.) The review of her care plan in August 2016, reflected similar findings. (Tr. 642.)

Plaintiff saw Dr. Kay on May 6, 2016, at which time she complained of dyspnea, aggravated by flexing the neck. (Tr. 697.) Her BMI was 38.32, and Dr. Kay ordered testing. (Tr. 701.)

On June 30, 2016, Plaintiff returned to Dr. McFadden, reporting that "she is cycling back upwards out of a depression episode" with low mood for two months. (Tr. 625.) "She still has anxiety about doing things outside of the house" and drives only for short distances; she has nightmares about the auto accident in which the other person dies. (*Id*.) Mental status exam was normal. (Tr. 625-26.) Lithium and Prasozin were increased. (Tr. 626.)

At the follow up visit at the Sneeze and Snooze Clinic with Dr. Patel on July 19, 2016, Plaintiff complained of fatigue and sinus drainage. (Tr. 501.) She reported getting headaches "all the time," staying awake due to PTSD, and having depression; she described the symptoms as severe. (Tr. 602.) She weighed 250 pounds, a BMI of 36.91. (Tr. 602.) Earlier diagnoses were confirmed. (*Id*.)

Plaintiff saw Dr. Kay on July 26, 2016, to follow up on dyspnea ("comes in waves") and hypothyroidism ("moderate," unchanged). (Tr. 691.) Physical exam was normal; her thyroid medication was adjusted, and she was to call if having dyspnea with exertion/lying down. (Tr.

695.) Plaintiff returned on September 27, for bilateral ear pressure and dizziness ("rocking boat sensation"). (Tr. 688.) Her BMI was 38.32; Dr. Kay ordered laboratory tests. (Tr. 690.)

On November 4, 2016, Plaintiff saw Dr. McFadden again, after missing three appointments with him and stopping therapy at Oaklawn in mid-August; she "continue[d] to struggle with daily anxiety symptoms and is quite isolated at home." (Tr. 608, 618-19.) "Energy is low" and "she is sleeping on and off during the day;" she still has anxiety about going out of the house. (Tr. 619.) Plaintiff planned to see Ms. Barnett, a therapist who treated her as a child and young adult. (*Id*.)

When Plaintiff met with Dr. McFadden on January 13, 2017, she reported "several partial panic attacks recently" due to stress on the anniversary of two auto accidents. (Tr. 612.) She was considering getting a therapy dog. (*Id*.) Plaintiff felt humiliated by applying for disability and procrastinated doing it; she feels like a failure. (*Id*.) She felt "very anxious coming to the appointment today"; her blood pressure was 160/120. (Tr. 613.) On exam, her affect was somewhat anxious, and she was briefly tearful when talking about her dog dying recently. (*Id*.) Her mood was low, which she attributed to anxiety. (*Id*.) Plaintiff admitted she "beats herself up" about having PTSD. (*Id*.) Her four therapy sessions with Ms. Barnett were helpful. (Tr. 612.)

On January 19, 2017, Plaintiff followed up with Dr. Neer, reporting an increase in the frequency of the migraines. (Tr. 659.) She weighed 256 pounds, a BMI of 38.92, and her blood pressure was 156/98. (Tr. 663.) Dr. Neer assessed: (1) pseudotumor cerebri, stable; (2) intractable migraine, stable; and (3) hypertension. (Tr. 663-64.)

The next day, January 20, Plaintiff saw Dr. Kay about her elevated blood pressure and mild symptoms of hypothyroidism (perspiration, intolerance to heat, and rapid heartbeat). (Tr. 684.) Her blood pressure that day was 137/79 and her BMI was 38.16. (Tr. 686.) Dr. Kay diagnosed

essential hypertension and added Norvasc to her extensive pharmacotherapy. (*Id*.)

Plaintiff returned to Dr. McFadden on March 10, 2017, reporting having good and bad days; on bad days she has "considerable amount of anxiety even though she stays at home," and feels "spacey." (Tr. 753.) She has acute anxiety when driving or riding in a car, and avoids going out of the house unless she goes with family; despite having contact with friends, she is more socially isolated than in the past. (*Id*.) Plaintiff continued to take steps to get "a service dog trained in PTSD." (*Id*.) Her energy was still low. (*Id*.) On exam, her affect was mildly anxious. (Tr. 754.) Dr. McFadden and Plaintiff "talked at length about the ways she could use a dog to begin to increase her activity"; he continued Prasozin, Lithium, Venlafaxine, Lamictal, and Xanax. (*Id*.)

On March 24, 2017, Jean Krabill Miller, LCSW, LMFT, developed a plan of care at Oaklawn for Plaintiff, who was referred by Dr. McFadden. (Tr. 759-60.) The plan reflected Dr. McFadden's diagnoses—bipolar I disorder, PTSD, and generalized anxiety disorder—as well as the medical and psychosocial factors affecting treatment. (*Id*.) Plaintiff was "struggling with her mood and having severe panic attacks." (Tr. 760.) Ms. Miller recommended individual therapy; Dr. McFadden cosigned the plan. (Tr. 760-61.)

At her April 21, 2017 visit with Dr. McFadden, Plaintiff reported that her parents and husband had told her she needed to move back with her parents for a while; they said her husband "needed a break" and she needed more structure during the day. (Tr. 746.) The family criticized her "lack of progress" with treatment. (*Id*.) Plaintiff had ongoing anxiety, difficulty driving, and low energy. (*Id*.) Dr. McFadden noted that she continued to be ambivalent about activities outside the house. (Tr. 747.) While mental status exam was overall normal, Dr. McFadden discussed psychological testing to help delineate the degree of anxiety and personality factors that may be

14

involved in her anxiety and avoidance. (*Id*.) Plaintiff said she would consider it. (*Id*.)

On May 3, 2017, Jean Miller, Plaintiff's therapist, reviewed the plan of care and noted that Plaintiff was keeping regular individual therapy appointments with her and had begun family therapy with her parents to improve communication. (Tr. 885.) Plaintiff acknowledged that she "sometimes us[es] shopping to soothe herself and spends more $ than she can afford. She is in the process of filing for bankruptcy." (*Id*.)

On June 22, 2017, Plaintiff returned to Dr. McFadden and reported "several added stressors"; her husband filed for divorce, and in trying to work part-time, she realized she "can't handle it mentally or physically." (Tr. 879.) She had poor sleep, low energy, and low exercise tolerance; she still experienced nightmares about the accident. (*Id*.) Her affect was blunted. (*Id*.) Dr. McFadden continued all medications. (Tr. 880.) The care plan dated July 26, 2017, recommended continued medications, and individual and family therapy. (Tr. 874-77.)

Plaintiff saw Dr. Neer on July 20, 2017, for follow up; she reported that the pseudotumor cerebri headaches "are controlled," but the stress migraine headaches were worse. (Tr. 779.) She complained of fatigue, dyspnea, anxiety, depression and insomnia, among others. (Tr. 783.) She weighed 245 pounds, a BMI of 37.25. (*Id*.) Dr. Neer considered pseudotumor cerebri and hypertension stable but concluded that intractable migraine had "suboptimal response to treatment." (*Id*.) Other conditions were under psychiatric care. (Tr. 783-84.)

At her follow up visit with Dr. Kay on July 21, 2017, Plaintiff reported that her hypertension was stable, hypothyroidism was mild, and there had been improvement in her bipolar disorder, but functioning was very difficult. (Tr. 814.) She scored 7 on the PHQ-9, indicative of mild depression. (*Id*.) Blood work-up was ordered. (Tr. 817.)

Plaintiff met with Dr. McFadden on September 25, 2017, reporting frequent anxiety symptoms and having a new service dog, a Greyhound named Amelia. (Tr. 868-69.) She came with her dog to the appointment. (*Id*.) Energy was "still somewhat low" but mental status exam was normal. (*Id*.) She would continue therapy and all medications. (Tr. 870.) The review of the care plan confirmed the recommendations. (Tr. 863-67.) When Plaintiff returned to Dr. McFadden on December 26, she reported that her service dog had been very helpful, preventing her panic attacks and helping with the nightmares; however, she had frequent anxiety. (Tr. 858.) Her mental status was normal, and all medications were continued. (Tr. 858-59.) The treatment was endorsed in the care plan review dated January 17, 2018. (Tr. 853-56.)

When Plaintiff returned to Dr. Neer on January 16, 2018, she told her she was "under a ridiculous amount of stress" and headaches were the same—"2-3x/week." (Tr. 774.) She now had a service dog to help with anxiety. (*Id*.) Her BMI was 36.89. (Tr. 777.) Previous diagnoses were confirmed and deemed stable. (Tr. 777-78.)

On March 26, 2018, Plaintiff met with Dr. McFadden; she weighed 251 pounds, a BMI of 37.08. (Tr. 847.) She reported "an increase in irritability, poor sleep and racing thoughts at the beginning of March," and at the time Dr. McFadden had prescribed Latuda, which she found helpful in controlling her hypomanic symptoms. (Tr. 848.) She felt ready to start alternative psychotherapy methods for her history of sexual abuse, which had "a major impact in her life." (*Id*.) Her mental status was normal, and Dr. McFadden noted that "she interact[ed] very well with her service dog." (*Id*.) Latuda, and previous medications, were continued. (Tr. 849.)

At her June 7, 2018, appointment with Dr. McFadden, Plaintiff's PHQ-9 score was 14, which reflects moderate depression. (Tr. 910.) Latuda was helpful in preventing mood cycles, but

she had gained 15 pounds (she weighed 261 pounds, a BMI of 38.54). (Tr. 909-10.) She "manage[d] her anxiety with effort, still ha[d] difficulty doing a lot of things" but kept her routine fairly well. (*Id.*) Dr. McFadden recommended adjusting her medications. (Tr. 911.)

In 2017 and 2018, Plaintiff was seen at the Sneeze and Snooze Clinic on four occasions. (894-907.) Her EES scores were: 9 in 2017, and 8 in 2018. (Tr. 901, 904.) She was "[i]nstructed not to drive when drowsy and pull off the road and nap if [she] becomes drowsy when driving." (Tr. 903.) The diagnoses were hypersomnia, allergic rhinitis, and postnasal drip. (894-907).

In May 2017, a medical consultant found that Plaintiff's Pseudotumor Cerebri, Stress Migraines and Headaches were not severe. (Tr. 85-97.) A psychological consultant concluded that Plaintiff's Anxiety and Obsessive-Compulsive Disorders were severe, but she could perform simple tasks. (*Id.*) These assessments were affirmed. (Tr. 99-110.)

Plaintiff completed Function Reports on September 23, 2015, and April 30, 2017 (Tr. 222, 270), stating that she "sleep[s] all the time" but is not rested; she is tired all the time (Tr. 227, 271, 275). Her depression worsens her hypersomnia causing her to want to sleep all day. (Tr. 271.) She neglects her personal care. (Tr. 223, 271.) Her husband helps care for her dog. (Tr. 223.) While Plaintiff cooks and can perform household chores, she is unmotivated to do them. (Tr. 224.) Despite preparing a list of chores, they are not done. (Tr. 272.) She finds herself "stopped by fatigue, fear of failure, and being overwhelmed." (*Id.*) Plaintiff's anxiety is exacerbated by driving and riding in a car. (Tr. 225.) She reported being able to handle finances, but when manic she spends more, does not track the budget, and causes overdrafts and late fees. (Tr. 226, 274.) While she noted several events where she sees others, she stressed that she "rarely" attends them; she interacts with others mostly on the telephone. (*Id.*, Tr. 275.) Plaintiff reported difficulties with

17

memory, completing tasks, concentrating (affected by anxiety), and getting along with others. (Tr. 227.) Stress and changes in routine are handled "not well at all" (Tr. 228) or "very poorly" (Tr. 276). In 2015, she began getting flashbacks to the 2013 car accident (Tr. 228), which resulted in "disassociative [sic] and nightmares" (Tr. 276). They are "usually violent and anxiety producing," and it takes her hours to recover. (Tr. 277.) She described herself as "less tolerant, easily stressed, takes things personally, creates conflict, [has] no patience, [is] easily irritated & defensive, [she] seems[s] to only show/feel the extreme of emotions." (Tr. 275.)

Plaintiff also completed a Headache Questionnaire on April 29, 2017, detailing the type, frequency, and triggering conditions of her headaches. (Tr. 267.)

Plaintiff's's friend of 22 years completed a Third-Party Function Report on September 21, 2015, stating that they spend 3-4 hours a week together. (Tr. 214-21.) On "good days" Plaintiff attempts housework, but on "bad days" she "barely get[s] out of bed." (Tr. 214.) On "bad days," Plaintiff can sleep up to 18 hours a day due to hypersomnia; she "sleeps more frequently than normal." (Tr. 215, 219.) Chores require "lots of encouragement and detailed task lists" and take excessive amount of time. (Tr. 216.)  The friend reported that Plaintiff has difficulty concentrating and completing tasks; she "becomes overwhelmed with complicated tasks and essentially shuts down and completes nothing." (Tr. 219.)

Plaintiff's mother completed a Third-Party Function Report on March 20, 2017, noting that "some days, [Plaintiff] stays in her room all day," and other days she performs chores around the house. (Tr. 259.) Plaintiff neglects her personal care, "often forgets to eat," and has anxiety-related nightmares and headaches that interfere with her sleep. (Tr. 260.) Doing chores "depends on anxiety levels and PTSD episodes and headaches." (Tr. 261-62.) She drives only "within a

18

small radius from home" and only if having low anxiety and no headache. (Tr. 262.) While she

used to have hobbies, she "[h]as not crafted for 4 years, nor has she embraced photography," and

gardening is done with a family member by her side. (Tr. 263.) She has "become anti-social"; often

becomes defensive, argumentative, overwhelmed, and leaves. (Tr. 264.) She has problems with

memory, concentration, completing tasks, and talking; she isolates. (Tr. 264, 266.)

At the hearing before the ALJ, Plaintiff testified that she lives with her parents; she is

5'8.5" tall and weighs 250 pounds.(Tr. 33.) While she has a driver's license, she "rel[ies] on [her]

mother to drive [her] most places." (Tr. 34.) Plaintiff was in a car accident in 2013 that triggered

PTSD, and affected her bipolar disorder, hypersomnia, and headaches. (Tr. 37.) She no longer can

work because she feels "exhausted all the time"; she "ha[s] no energy." (Tr. 38.) She undergoes

intense therapy every two weeks to deal with a sexual assault at age 3 or 4; she has been in

therapy and taking medications since age 14. (Tr. 37-38.)

Unless the errand is in Goshen, her mother must accompany her (*id*.); however, her service

dog Amelia, which was recommended by her psychiatrist, Dr. McFadden, is with her whenever she

leaves the house (Tr. 40-41). Amelia alerts her of an impending panic attack by lying down, which

requires Plaintiff to go to her and rub her ears while working on her breathing exercises. (Tr. 41.)

Plaintiff has "minor [panic attacks] several times a week," usually after nightmares, but they do not

turn into full-fledged attacks thanks to her service dog. (*Id*.) During a panic attack, Plaintiff's heart

races, her breathing will be erratic, her muscles "freeze up," she becomes hypervigilant, and gets

tunnel vision. (Tr. 42.) Busy or loud traffic, sirens, or anything related to car accidents trigger

panic attacks. (*Id*.)

Plaintiff only has a few friends whom she sees once a month (Tr. 49-50); when she goes

with them for coffee, lunch or a movie, Amelia is with her (Tr. 43). On those occasions, Amelia

uses a grounding technique dogs use on anxiety patients: keeping part of her body on Plaintiff's

foot. (Tr. 50-51.) This happened at the hearing. (Tr. 51.) Plaintiff lives on the second floor of her

parents' home. (Tr. 43.) Plaintiff gets headaches "[a]t least two to three times a week," despite

taking three medications, and they last half a day. (Tr. 44-45.) Most headaches are light sensitive,

in the frontal part of the head, throbbing; none is "minor enough that [she] can still go on" with

her day. (Tr. 44.) She has nightmares at least three times a week (Tr. 46); before getting Amelia,

she would be up all night, but Amelia now wakes her up from the nightmares, which is helpful (Tr.

47). Plaintiff naps daily due to exhaustion or after having a panic attack. (Tr. 48.) Being in crowds

exacerbates her anxiety (Tr. 53), which has worsened as she works through her past trauma (Tr.

55).

　　　Richard Riedel, the VE, testified in response to a hypothetical question consistent with the

RFC. (Tr. 58.) The VE testified that the individual could perform the following light occupations:

Office Helper, DOT code 239.567-010; Cleaner, housekeeping, DOT code 323.687-014; and

Production Inspector, DOT 739.687-102. (Tr. 59.) Being off task more than 10% of the workday

or having more than 1 absence per month would not be tolerated. (Tr. 60.) Having a therapy dog

would require an accommodation. (Tr. 61.)

　　　In support of remand, Plaintiff first argues that the ALJ erred in finding Plaintiff's obesity

non-severe.  Step Two is the first inquiry the ALJ makes of a claimant's conditions, 20 C.F.R. §

404.1520 (2019), and when the evidence is not properly considered it affects the entire Decision.

*O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016) (erroneous elimination of

depression at Step Two resulted in a flawed ultimate decision). Because of its critical nature, the

Agency itself notes that "great care should be exercised" at Step Two. Social Security Ruling (SSR) 85-28, 1985 WL 56856,at *4 (Jan. 1, 1985).

Plaintiff argues that the ALJ's Step Two analysis is critically flawed because the ALJ erred in (a) finding Plaintiff's obesity was not severe, (b) not considering Plaintiff's obesity in combination with her bilateral ankle stability and left knee pain, (c) not considering Plaintiff's obesity in combination with her mental impairments, and (d) not considering Plaintiff's obesity in combination with her persistent complaints of fatigue and low energy. Plaintiff claims that her obesity warranted a severity finding at Step Two and that these Step Two errors affected the remainder of the Decision.

Plaintiff notes that the State Agency opinions cannot salvage the ALJ's errors at Step Two, or at any step thereafter. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Thomas v. Colvin*, 826 F.3d 953 (7th Cir. 2016); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). Plaintiff contends that, like the Seventh Circuit's remand in *Moreno*, the State Agency opinions in this case were outdated because there were abnormalities in new records which revealed "significant and new developments" that "bear directly" on Plaintiff's functioning. 882 F.3d at 728. Specifically, there were entire lines of evidence that the consultants did not consider, including Plaintiff's obesity, ankle instability, and left knee pain. (Tr. 85-97, 99-110.) Plaintiff points out that there is not one reference to these conditions in their opinions. Nor did they review the new records showing use of a service animal, or any of the newer records submitted after their review. Plaintiff further contends that, given the combination and interrelatedness of Plaintiff's conditions, the omission is a reversible error. "Obesity is a complex, chronic disease." SSR 02-1p, 2002 WL 34686281, at *2 (Sept. 12.

2002). According to SSR 02-1p, a person is obese if their BMI exceeds 30. *Id*., at *2. In the

Decision, the ALJ stated Plaintiff had a BMI of 36.2, which is classified as obese, but found that

her obesity was not severe. (Tr. 13.) Plaintiff claims that the ALJ simply cited the provisions of

SSR 02-1p, without providing any real analysis of Plaintiff's obesity in combination with her other

impairments.

Plaintiff contends that the ALJ's assessment of Plaintiff's obesity is factually incorrect.

Plaintiff asserts that it is clear that she was chronically obese and the ALJ's one reference to a

"BMI of 36.2" is insufficient. *See* SSR 02-1p, 2002 WL 34686281, at *6 ("[W]e will also consider

the individual's weight over time."). The record demonstrates that beginning in March 2013, and

remaining generally consistent through June 2018, Plaintiff's BMI reached or exceeded 30, often

near 38, but as high as 41.6 in May 2014. (Tr. 383-84, 389-93, 419, 452, 492, 507, 510, 513, 576,

602, 663, 674, 686, 690, 701, 704, 783, 847, 909-10.) In fact, the ALJ's reference to a BMI of

36.2, is on the lower end of readings throughout the entire time period. *Id*. Plaintiff notes that a

proper review of the BMIs represents both Level II and Level III obesity. *See* SSR 02-1p, WL

34686281, at *2 (Level II includes BMIs of 35.0 – 39.9. Level III or "extreme obesity" is a BMI

equal to or greater than 40.0) Thus, Plaintiff contends that the ALJ's assessment that she only had

a BMI of 36.2 is incorrect given the higher BMIs and that the ALJ's conclusion is a

misrepresentation of the evidence. *Golembiewski*, 322 F.3d at 916-17 ("An ALJ may not

mischaracterize evidence of a disability that contradicts the ALJ's ruling."); *Hill v. Comm'r of Soc.

Sec*., No. 14 CV 96665 (GBD) (BCM) 2017 WL 5632813, at *5 (S.D.N.Y. July 28, 2017) ("It is

well-settled that an ALJ may not mischaracterize the record, nor rely on such a mischaracterization

to meet the substantial evidence test."); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998) (ALJ's

logical bridge must be accurate and logical).

Plaintiff also asserts that her obesity would further aggravate her ability to work and her other conditions. SSR 02-1p notes that obesity "often complicates" respiratory and musculoskeletal body systems, conditions that afflict Plaintiff. Plaintiff notes that the ALJ failed to consider the effect Plaintiff's obesity would have on her bilateral lateral ankle instability and left knee pain. In June 2014, Plaintiff participated in rehabilitation for bilateral lateral ankle stability. (Tr. 337, 343, 349.) Her instability prevented her from walking and climbing stairs. (Tr. 343, 345.) During this time, Plaintiff was also experiencing Level II and III obesity. (Tr. 507, 576.) A year later, in August 2015, Plaintiff visited a physician for left knee pain and was prescribed a knee brace, rest, ice and heat, and an anti-inflammatory medication. (Tr. 445-46.) At this time, Plaintiff's BMI ranged from 38.24 to 36.26. (Tr. 383-84, 674.) Plaintiff argues that the evidence demonstrates that Plaintiff's obesity, diagnosed in conjunction with her lower extremity conditions, would impact her left knee and bilateral lateral ankle conditions. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) ("A great many people who are not grossly obese and do not have arthritic knees find it distinctly uncomfortable to stand for two hours at a time. To suppose that [claimant] could do so day after day on a factory floor borders on the fantastic, but . . . has no evidentiary basis that we can find.").

Plaintiff additionally notes that SSR-02-1p explains that obesity may contribute to mental impairments, a condition from which the Plaintiff suffers. Plaintiff points out that her medical records show a link between her mental impairments and obesity. Further, Plaintiff's medical records also show a link between her persistent complaints of fatigue and obesity

Moreover, records document that she was sleeping more due to depression. (Tr. 509.)

23

When addressing her obesity with a therapist, it was noted that Plaintiff "has experienced a prolonged depressive episode since a year ago, which has made it difficult to adopt healthier lifestyle habits." (Tr. 577.) Likewise, Dr. Kay noted that her weight management was difficult to control due to her depression. (Tr. 450.) And because she was still gaining weight, Ms. Gladfelter discussed "how this can affect the pseudotrumor" [sic] (Tr. 511), yet another condition impacted by Plaintiff's obesity. Plaintiff maintains that all of the above facts show a connection between Plaintiff's many conditions and her obesity.

Plaintiff argues that the above errors are not simply limited to Step Two, as they infected the remainder of the Decision. Plaintiff contends that because the ALJ failed to consider the evidence at Step Two, the Step Three determination, which is built on the Step Two finding, and the RFC, which flows from Steps Two and Three, is equally flawed. *Ridinger v. Astrue*, 589 F. Supp. 2d 995, 1005 (N.D. Ill. 2008) ("Because the scope and severity of the impairments evaluated at Step Two can impact the ALJ's equivalence determination at Step Three and [the RFC] determination at Step Four, remand is warranted where the ALJ fails to consider the entirety of the evidence at Step Two.").

In response, the Commissioner claims that  the ALJ mentioned Plaintiff's obesity and that the characterization of Plaintiff's obesity as non-severe rather than severe is irrelevant.

However the Commissioner's argument fails. *Gore v. Berryhill*, No. 3:17-cv-5-JD, 2018 WL 1376708, at *4 (N.D. Ind. Mar. 19, 2018) (the excerpt "is more aptly characterized as a passing reference than as an 'explanation.'"). An ALJ is required to actually consider a claimant's conditions in combination. *Christine F. v. Saul*, 2:19-cv-359, 2020 WL 1673033, at *8-11(N.D. Ind. Apr. 6, 2020) (the ALJ "had" to consider the conditions in combination); *see also* 20 C.F.R.§

24

404.1523(c) ("[W]e will consider the combined effect of all of your impairments"). Thus, the

ALJ's general statement that she considered the combination of Plaintiff's conditions is

inadequate, particularly given that the ALJ did not address Plaintiff's obesity in crafting the RFC.

*Nathensen v. Berryhill*, No. 2:17-CV-49-JEM, 2018 WL 1444331, at *4 (N.D. Ind. Mar. 23,

2018) ("The bare statement that the ALJ had taken all of [claimant's] impairments, including

obesity, into account does not show the Court how, if at all, the ALJ incorporated [claimant's]

obesity into his RFC").

Clearly, the Commissioner's suggestion that any error is harmless because the ALJ found

at least one severe impairment at Step Two and proceeded through the sequential evaluation  is

unconvincing. Later Steps of a decision cannot cure critical errors in earlier Steps because each

Step requires a unique analysis. *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008) ("RFC analysis

is not a substitute" for errors in earlier stages of an ALJ's decision "even though some of the

evidence considered may overlap"). Nor can earlier Steps in the sequential evaluation be "skipped"

or minimized, even though some of the evidence considered later may overlap. *Hair v. Astrue*, No.

5:10-cv-309-D, 2011 WL 2681537, at *7 (E.D.N.C. June 16, 2011) (citations omitted).

The Commissioner relies on *Curvin v. Colvin*, 778 F.3d 645 (7th Cir. 2015), to support the

position that the Step Two error was harmless. However, in *Curvin*, the ALJ actually considered

all of the severe and non-severe impairments and considered the evidence of the conditions. Here,

however, the ALJ did not consider all of the abnormalities related to Plaintiff's obesity at Step

Two. Without properly accounting for Plaintiff's conditions at Step Two, the ALJ could not

adequately determine listing level severity at Step Three or Plaintiff's RFC. *See* 20 C.F.R. §

404.1526(c) ("[W]e consider all evidence in your case record about your impairment(s) and its

effects on you that is relevant to this finding."); id. § 404.1545 ("We will assess your residual

functional capacity based on all of the relevant medical and other evidence.").

    The Commissioner argues that Plaintiff has the burden of proof at Step Two. Nevertheless,

it is the ALJ's obligation to consider all the evidence, 20 C.F.R. § 404.1520, and build an accurate

and logical bridge between the evidence and the result. *E.g., Varga v. Colvin*, 794 F.3d 809,

813 (7th Cir. 2015); *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Arnett v. Astrue*, 676

F.3d 586, 593 (7th Cir. 2012) (Even if claimant does not provide evidence of limitations, it is the

ALJ's duty to "consider all of the evidence" and explain the decision so that it can be

"meaningfully reviewed"). Here, the ALJ was required to properly consider Plaintiff's obesity at

Step Two, and provide the bridge of how it impacts Plaintiff's claim, particularly in combination

with her other impairments. The Step Two analysis in this case is unsupported given evidence

showing (1) diagnoses of obesity in conjunction with Plaintiff's left knee and bilateral ankle

conditions, and (2) the link between her obesity and mental impairments, including anxiety,

depression, and fatigue.

    Additionally, the Commissioner's argument that the ALJ properly found Plaintiff's obesity

to be nonsevere because Plaintiff did not claim obesity in her application is unavailing. First, the

technical rules of pleading are inappropriate in this context. *Cannon v. Harris*, 651 F.2d 513, 519

(7th Cir. 1981) (regulations require the ALJ to assess not only the claimant's alleged impairments,

but also those which can be adduced by the evidence). Second, Social Security proceedings are

"inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000); see 20 C.F.R. §

404.900(b). The ALJ acts as "an examiner charged with developing the facts," *Richardson v.*

*Perales,* 402 U.S. 389, 410 (1971), and has a duty to "develop the arguments both for and against

granting benefits," *Sims*, 530 U.S. at 111. Third, the ALJ has the independent duty to weigh and consider "all evidence." 20 C.F.R. § 404.1520(a)(3). And in any event, the Commissioner's focus on the physical aspect of obesity alone is entirely misplaced. Obesity can be premised on a mental condition and affect mental functioning. Further, contrary to the Commissioner's position, the medical records do indicate that Plaintiff's weight impact her other conditions

For these reasons, the ALJ's Step Two finding is not supported by substantial evidence and remand is required on the issues raised above.

Next, Plaintiff argues that the ALJ erred at Step Three.  Step Three necessitates close evaluation given its dispositive nature 20 C.F.R. § 404.1520(a)(4)(2019). It requires two independent conclusions—*i.e.*, whether a claimant's conditions, individually and then in combination, (1) meet or (2) equal a listed impairment. *See* 20 C.F.R. §§ 404.1520 (2019), 404.1525 (2019), 404.1526 (2019). The medical equivalence analysis is complex, as it requires consideration of all the conditions. Plaintiff argues that, in the present case, the Step Three analysis is flawed because of errors in the (1) "B Criteria" determination and (2) medical equivalence analysis.

With respect to the "B Criteria", the ALJ assigned mild limitations in understanding, remembering, or applying information; and moderate limitations in  interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Tr. 13-15.) Plaintiff contends that the ALJ stressed the normal mental status examinations in each factor, while ignoring evidence favorable to Plaintiff that supported greater restrictions

The State Agency psychological consultants concluded both initially (Tr. 92-93) and on reconsideration (Tr. 105) that Plaintiff had mild limitations in understanding, remembering, or

applying information, interacting with others, and adapting or managing oneself, and moderate

limitations in concentrating, persisting, or maintaining pace. These ratings were entirely different

than the ALJ's ratings. The ALJ's "B Criteria" determination and subsequent RFC acknowledge a

deterioration in Plaintiff's condition based on the new records. Thus, Plaintiff maintains that an

updated medical opinion was necessary. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996),

teaches that the ALJ "must not succumb to the temptation to play doctor and make their own

medical findings," a teaching that cases such as *Blakes ex rel. Wolf v. Barnhart*, 331 F.3d 565,

570 (7th Cir. 2003), reframe as precluding ALJs from relying on their own opinions to fill gaps in

the record..

Plaintiff further argues that, in making her "B Criteria" determination, the ALJ failed to

consider Plaintiff's Axis III and IV diagnoses. *See* DSM-IV-TR at 29 (Axis III diagnoses are "for

reporting current general medical conditions that are potentially relevant to the understanding or

management of the individual's mental disorder"); *id.* at 31 (Axis IV diagnoses, used "for

reporting psychosocial and environmental problems that may affect the diagnosis, treatment, and

prognosis of mental disorders"). These would impact each of the function areas below, as well as

the RFC. Plaintiff also argues that the ALJ failed to consider Plaintiff's need for a service animal.

Plaintiff obtained a service dog to help with her anxiety and panic attacks. (Tr. 40-41, 774, 858.)

She reported that the dog accompanies her anytime she leaves her house. (Tr. 40-41.) Dr.

McFadden's records note the need for the service animal. (Tr. 774, 848, 858, 868-69.) Plaintiff

points out that this evidence is significant as it would affect each of the mental function areas.

*Rentfro v. Colvin*, No. 14-cv-3015, 2015 WL 12868081, at *13 (C.D. Ill. Oct. 21, 2015) ("The

ALJ's failure to address adequately the evidence regarding the use of the service dog is

material.").

With respect to understanding, remembering, or applying information, the ALJ determined that Plaintiff had mild limitations in this area because, despite some reports, she is able to manage money, pay bills, and follow written instructions very well, and exams showed logical associations, mostly appropriate thought content, sequential thought processes, intact short-term and long-term memory, and average knowledge level. (Tr. 14.) Plaintiff contends, however, that the ALJ failed to build an accurate and logical bridge in this regard.

The ALJ noted Plaintiff is able to manage her money. However, her functioning in this area is not appropriate. She "sometimes us[es] shopping to soothe herself and spends more $ than she can afford. She is in the process of filing for bankruptcy." (Tr. 885; *see also* Tr. 226, 274 (Plaintiff overspends, does not track budget and causes overdrafts and late fees).) The ALJ also noted that Plaintiff follows instructions, but failed to note the surrounding circumstances. (Tr. 216 (Plaintiff's friend reports that she requires a "detailed task list" to complete household chores), Tr. 219 (Plaintiff has difficulty concentrating and completing tasks), Tr. 264, 266 (Plaintiff's mother reports that Plaintiff has problems with memory, concentration, and completing tasks). Plaintiff argues that the omission of this relevant evidence entirely undermines the ALJ's finding.

With respect to interacting with others, the ALJ determined that Plaintiff had a moderate limitation in interacting with others. (Tr. 14.) While the ALJ noted some reports, the ALJ assigned a moderate limitation based on Plaintiff's report that she has no problems getting along with authority figures or attending parties and going out with friends, and exams showing she was alert, fully oriented, well-groomed, and cooperative with normal speech and logical associations. (*Id.*) Plaintiff contends these grounds are insufficient.

Plaintiff claims that the ALJ relied on selected evidence to support her assessment of moderate limitations and that the ALJ's review of selected statements is improper and not consistent with other evidence indicating that Plaintiff had greater limitations. For example, the ALJ failed to address evidence of Plaintiff's anxiety and panic attacks prompted by social interactions. Plaintiff contends that the omission of this renders the ALJ's analysis flawed.

Plaintiff further claims that the ALJ also failed to consider evidence of Plaintiff's social isolation, neglecting her personal care, and spending most of her time in bed. This was not addressed in the ALJ's analysis.

With respect to concentrating, persisting, or maintaining pace, while the ALJ noted some reports, the ALJ assigned moderate limitations because Plaintiff indicated she could follow instructions, manage money, and pay bills, and exams showed Plaintiff was alert, fully oriented, cooperative with sequential thought processes, and had adequate attention and concentration and average knowledge level. (Tr. 14.) However, as Plaintiff notes, contrary to the ALJ's analysis, the record is replete with examples of greater deficits in this area.

As noted above, the ALJ failed to consider Plaintiff's panic attacks and flashbacks. This would impact her ability to maintain concentration and focus. Further, the ALJ failed to consider the frequency and severity of Plaintiff's headaches, which also would impact her concentration. Additionally, the ALJ failed to analyze Plaintiff's complaints of fatigue and low energy, which would affect her abilities in this function area.

With respect to adapting or managing oneself, the ALJ found Plaintiff had a moderate limitation in adapting or managing oneself because she found that Plaintiff was independent with activities. (Tr. 14.) Plaintiff argues that this analysis fails for two reasons. First, Agency

30

regulations require the ALJ to consider the degrees, not absolutes, of activities. *See* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(F)(1) (2019) ("We will consider, for example, the kind, degree, and frequency of difficulty you would have."); *id.* at § 12.00(F)(3)(d) (Agency will look to see how independently, appropriately, effectively, the activity is done and whether it is performed on a sustained basis). This has been emphasized in this Circuit—an ALJ may not consider daily activities, without looking at the qualifications inherent in those activities. *Thompson v. Berryhill*, 722 Fed. App'x 573, 582 (7th Cir. 2018); *Childress v. Colvin*, 845 F.3d 789, 792 (7th Cir. 2017). Second, as with other areas of functioning, the ALJ simply "cherry picked" and addressed absolutes, while ignoring evidence favorable to Plaintiff.

Plaintiff concludes that, contrary to the ALJ's analysis, the record is replete with examples of greater deficits in this area and there is no evidence that her activities were done independently, appropriately, effectively, or on a sustained basis,

Plaintiff also asserts that the ALJ failed to properly consider medical equivalence. Plaintiff argues that the ALJ's Step Three is fundamentally flawed because it does not account for all of the evidence. Rather, according to Plaintiff, the ALJ's Step Three analysis (Tr. 13) simply contains boilerplate language and fails to properly consider whether Plaintiff's impairments either individually, or in combination, medically equal a relevant listing. *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) ("boilerplate" credibility language is "meaningless"). In assessing medical equivalence, the ALJ must look at the signs, symptoms and laboratory findings of all impairments to determine if they medically equal a Listing. Plaintiff maintains that the ALJ failed to assess the requirements of the relevant listings or analyze the evidence of medical equivalence and that this perfunctory analysis is devoid of any evidentiary consideration. Plaintiff argues that

31

the ALJ's purported "consideration" is precisely the type of "analysis" the Seventh Circuit has repeatedly rejected. *See, e.g., Ribaudo*, 458 F.3d at 584 (remanding for a "more thorough analysis" of Step 3 because the ALJ's failure "to evaluate any of the evidence that potentially supported Ribaudo's claim does not provide much assurance that he adequately considered Ribaudo's case").

Plaintiff notes that there is no medical consultant opinion on whether the combination of all impairments might warrant a finding of medical equivalence. For example, only the psychological consultants considered Plaintiff's claim at Step Three. Plaintiff points out that there was no medical consultant opinion at Step Three as they opined that Plaintiff's medical conditions were non-severe and any opinion they rendered was unsupported given the ALJ's own findings that Plaintiff's headaches, a medical condition, was severe. Plaintiff contends that the need for an updated medical opinion is even more critical given Plaintiff's obesity.

In response, the Commissioner argues that the ALJ did not overlook evidence and that the ALJ reasonably concluded that the record only supported the given RFC. However, the ALJ's "RFC analysis is not a substitute" for the erroneous Step Three analysis. *Craft*, 539 F.3d at 675; *see also Reece v. Colvin*, 1:13-cv-1063-SEB-MJD, 2014 WL 4722534, at *4 (S.D. Ind. Sept. 22, 2014) ("[T]he Court cannot find that the remainder of the ALJ's analysis was so thorough that her failure [at Step Three was] a mere formality."); *Nichols v. Colvin*, No. 3:13-cv-1205-CAN, 2015 WL 196379, at *5 (N.D. Ind. Jan. 13, 2015)(the RFC does not save the Step Three as "[i]t shed little to no light on how or if [the] [severe impairments] met or medically equaled a Listing").

As discussed above, the ALJ erred in considering the "B Criteria" because she focused on normal findings, while ignoring evidence that supported a contrary conclusion. The Commissioner

restates what the ALJ considered, without addressing why that was insufficient. This fails because,

here, Plaintiff demonstrated that there was critical evidence that needed to be considered but was

not, including her: (1) Axes III and IV diagnoses; (2) need for a service animal; (3)

mismanagement of finances; (4) difficulty concentrating and completing tasks; (5) problems with

memory; (6) anxiety, mood swings, and panic attacks prompted by social interactions; (7) PTSD

flashbacks; (8) severe bouts of depression; (9) social isolation and neglect of personal care; (10)

headaches (including their frequency and severity); (11) fatigue and low energy; and, (12)

diagnosed hypersomnia and associated ESS scores. Thus, the evidence the ALJ—and then the

Commissioner—relied on is insufficient. *Gore*, 2018 WL 1376708, at *4 (N.D. Ind. Mar. 19,

2018) (a passing reference is not an explanation).

      The ALJ also failed to properly consider medical equivalence. The State Agency

consultants did not assess crucial evidence and, accordingly, there is no medical opinion that

considered the combination of all of Plaintiff's impairments at Step Three. Contrary to the

Commissioner's argument, even if an ALJ finds a claimant more limited than the State Agency

consultants, an "evidentiary deficit" exists when the ALJ substitutes her own conclusions for those

of the consultants without relying on alternative medical opinions. *Christine F.*, 2020 WL

1673033, at *5. Here, as in *Christine F.*, the ALJ rejected the opinion of the State Agency

consultants by finding that Plaintiff (1) had the severe impairment of headaches, and (2) had

moderate, as opposed to mild, limitations in interacting with others and adapting or managing

herself. Thus, the ALJ's Step Three determination is unsupported. *Moon v. Colvin*, 763 F.3d 718,

722 (7th Cir. 2014)("ALJs are required to rely on expert opinions instead of determining the

significance of particular medical findings themselves."); *Wesolowski v. Colvin*, No. 15 C 8830,

2016 WL 6082353, at *3 (N.D. Ill. Oct. 18, 2016) (if an ALJ discounts the opinions of medical experts, including State Agency consultants, "the ALJ [is] obligated to seek out additional expert assistance" and not make her own medical determinations). Where, as here, the evidence reasonably could support a finding that Plaintiff's impairments medically equal a Listing, remand is warranted so that the ALJ may obtain a medical opinion.

Next, Plaintiff argues that the ALJ erred in crafting the RFC. The RFC is a determination of the most a claimant can do despite her limitations. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is based upon consideration of "all relevant evidence in the case record." *Id.*, at *5. Plaintiff argues that, because of the errors noted above, the RFC is unsupported. Plaintiff contends that the RFC does not accommodate all of Plaintiff's conditions because it fails to properly accommodate Plaintiff's physical and mental limitations.

Plaintiff asserts that the ALJ's RFC for work at "all exertional levels" is flawed because it ignored Plaintiff's obesity. Plaintiff further asserts that the RFC fails to identify any reasonable restriction to accommodate Plaintiff's headaches, which the ALJ found were a severe impairment. *Manker v. Berryhill*, No. 16 C 10704, 2017 WL 6569719, at *4 (N.D. Ill. Dec. 22, 2017)(the ALJ's failure to determine the frequency and duration of claimant's required bathroom breaks and the practical workday limitations resulting from the claimant's Crohn's is an error requiring remand); *Rasmussen v. Astrue*, No. 10 C 2344, 2011 WL 1807019, at *11 (N.D. Ill. May 6, 2011) (similar); *Woods v. Barnhart*, No. 02 C 4893, 2004 WL 769380, at *9-11 (N. D. Ill. Apr. 9, 2004) (similar). Plaintiff notes that, despite evidence that Plaintiff's headaches are exacerbated by light and sound, the RFC is silent regarding exposure to noise or lights, rendering the RFC unsupported.

34

Plaintiff points out that despite the presence of headaches and diagnoses of rhinitis and postnasal drip (Tr. 599), the RFC allows frequent (2/3 of the workday) exposure to extreme heat, cold, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 15.) Plaintiff asserts that there is no logical bridge for this conclusion. *See* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion . . . ."). Plaintiff notes that the evidence indicates that some of Plaintiff's headaches were "weather related" and her rhinitis and postnasal drip were treated, at least in part, with environmental control. (Tr. 490, 601.)  Plaintiff concludes that the ALJ failed to build an accurate and logical bridge between the evidence and the "frequent" exposure limitation in the RFC.

As discussed above, Plaintiff also contends that the ALJ erred in finding Plaintiff had mild and moderate limitations under the "B Criteria."  Plaintiff additionally argues that the RFC also fails to account for Plaintiff's ability to accommodate to the stress and demands of work and work-like settings. In this regard, SSR 85-15 is instructive—

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day . . . . Thus, the mentally impaired may have difficulty meeting the requirement of even so-called "low stress" jobs.
>
> *   *   *
>
> Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

1985 WL 56857, at *6.

Plaintiff also argues that the ALJ erred in assessing Plaintiff's and third-party statements. Plaintiff contends that the ALJ's credibility analysis appears to be based solely on selective objective medical evidence and conclusions about Plaintiff's activities, and the ALJ's focus on

normal objective medical evidence is misplaced. While the ALJ reviewed some of the medical

evidence, the objective findings cannot serve as a basis for dismissing Plaintiff's statements. Here,

Plaintiff argues that the ALJ failed to properly analyze and discuss the abnormal findings from

exams, all of which support Plaintiff's statements and the ALJ did not address and/or erroneously

discounted other evidence corroborating Plaintiff's symptoms as previously identified herein.  SSR

16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017)("[W]e instruct our adjudicators to consider all of

the evidence in an individual's record when they evaluate . . . symptoms . . . .")

Plaintiff claims that the ALJ's focus on Plaintiff's activities is misplaced. The ALJ

concludes that Plaintiff is not disabled, in part, because she found Plaintiff was independent with

personal care, able to care for her dog, prepares simple meals, does household chores and repairs,

drives a car, shops, uses a computer, manages money, pays bills, bakes, gardens, reads, socializes

with friends, and attends parties. (Tr. 19.)

However, as Plaintiff points out, the ALJ's conclusion that the activities were not "limited

to the extent one would expect" is not a standard found in the regulations, rulings, or case law.

(Tr. 19.) Also, the ALJ discussed all of the activities in absolutes and not in degrees. *Roddy v.*

*Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) (noting that a person's ability to perform daily

activities, especially if that can be done only with significant limitations, does not necessarily

translate into an ability to work full-time); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)

(home and work are not the same thing).

An ALJ is "obliged" to examine and weigh all the evidence, including third-party reports.

*Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994). These opinions are important and necessitate

proper consideration. In this case, the ALJ rejected statements of Plaintiff's mother, and her friend,

36

claiming that because they were not "medically trained to make exacting observations[,] . . . the accuracy of the information provided is questionable." (Tr. 18.) Plaintiff contends that this cannot serve as a proper basis for rejecting these statements.

Plaintiff correctly notes that third parties do not have to be medical professionals in order to submit supportive statements. *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996). Even the Agency recognizes the importance of statements from family members. 20 C.F.R. § 404.1545(a) (3)(permitting claimant to submit "descriptions and observations" about her functional limitations from "family, neighbors, friends, or other persons"); SSR 16-3p, 2017 WL 5180304, at *7 (non-medical sources such as family and friends may provide helpful information in order to assess the claimant's intensity, persistence, and limiting effects of symptoms and must be considered properly). Thus, the ALJ cannot simply disregard the statements because they are "not medically trained to make exacting observations." *Teschner v. Colvin*, No. 15 C 6634, 2016 WL 7104280, at *9 (N.D. Ill. Dec. 6, 2016); *Collins v. Berryhill*, No. 17 C 3589, 2018 WL 3361847, at *4 (N.D. Ill. July 10, 2018).

In response, the Commissioner asserts that the RFC is supported by the record because the ALJ limited Plaintiff to simple and routine tasks and prohibited production rate jobs. The Commissioner also claims that the record does not support the need for a service animal.

Clearly, the RFC is not supported by substantial evidence because it does not accommodate all of Plaintiff's conditions. Even if Plaintiff's obesity was not a severe impairment, it still must be factored into the RFC. *See* 20 C.F.R. § 404.1545(a)(1) (RFC is based on all the relevant evidence in your case record); *id*. § 404.1545(a)(2) (we will factor your non-severe impairments into the RFC); SSR 96-8p, 1996 WL 374184 at *5 (non-severe may be "critical to

37

the outcome of a claim."); *id.* (the RFC must be based on all of the relevant evidence). In this case, Plaintiff pointed to specific clinical findings in her longitudinal history and their impact on her functioning, all of which serves as foundational evidence for the RFC, and would warrant restrictions. Because the ALJ did not address highly pertinent, objective, clinical, and other evidence that contradicts the Decision, there is no "logical connection between the evidence and [her] conclusion[s] [in the RFC]." *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017); SSR 96-8p, 1996 WL 374184, at *7 (The ALJ "must" describe how "the evidence supports each conclusion . . . .").

Also, the RFC fails to identify reasonable restrictions to accommodate Plaintiff's headaches. The ALJ (1) determined that Plaintiff's headaches are a severe impairment; (2) noted pseudotumor cerebri and chronic headaches diagnoses; (3) acknowledged Plaintiff's testimony that she experiences headaches a couple times a month in addition to severe migraine headaches that require her to lie down half the day, cause sensitivity to light and sound, nausea, dizziness, and extremity numbness, and can be alleviated by going to a quiet and dark room, taking emergency medications, and using an ice pack; and, (4) noted that Plaintiff takes daily and emergency medication for her headaches. (Tr. 12, 15-17.) Yet the ALJ failed to determine whether Plaintiff's headaches would require her to take breaks during the workday or miss work altogether. *Moore v. Colvin*, 743 F.3d 1118, 1127-28 (7th Cir. 2014) (RFC, which "did not reflect any likelihood of absences or breaks at work related to migraines[,] . . . [was] simply unsupported by the record"); *Gregory B. v. Saul*, No. 2:19cv184, 2020 WL 995828, at *8 (N.D. Ind. Mar. 2, 2020). This is critical given that the VE testified that being off task more than 10% of the workday or missing more than one day per month would not be tolerated. (Tr. 59-60.)

38

Likewise, there is no accurate and logical bridge to conclude that Plaintiff could perform work at "all exertional levels" given evidence of her obesity, ankle instability, and left knee pain, and the limitations they cause. *Johnson v. Colvin*, No. 2:14–CV–47–JEM, 2015 WL 1486803, at *6 (N.D. Ind. Mar. 31, 2015) (it was not clear whether ALJ considered claimant's obesity, headaches, and fatigue in combination and whether that consideration was reflected in the RFC).

Further, because the "B Criteria" analysis did not account for key evidence of Plaintiff's limitations, the RFC failed to properly factor Plaintiff's anxiety, depression, fatigue, hypersomnia, and pain, which affect her ability to perform mental tasks, including concentrating and maintaining persistence or pace. *Jesus F.*, 2019 WL 6872815, at *5. And, contrary to the Commissioner's argument, nowhere in the Decision does the ALJ explain how the limitations to "simple instructions and routine and repetitive tasks," no production rate pace, and ability to concentrate for two-hour intervals, adequately accommodate Plaintiff's mental limitations. *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir. 2019) and *Brian P. v. Saul*, No. 18 C 3498, 2020 WL 231081, at *4 (N.D. Ill. Jan. 15, 2020); *see also, Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). Nor did the RFC account for Plaintiff's inability to handle stress

The cases upon which the Commissioner relies are factually distinguishable. In *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020), the ALJ included, and explained, restrictions on performing "simple tasks," remembering "simple work-like procedures," making "simple workrelated decisions," "meet[ing] production requirements" because the claimant could stay on-task, and needing "an environment that allowed [claimant] to sustain a flexible and goal oriented pace." Thus, the Seventh Circuit held that the ALJ adequately accounted for and explained how the restrictions accommodated the claimant's limitations in concentration,

persistence, or pace. *Id*. Here, the ALJ did not explain how the restrictions accommodated

Plaintiff's moderate limitations and, therefore, did not build the requisite bridge.

Likewise, in *Urbanek v. Saul*, 796 F. App'x 910, 914 (7th Cir. 2019), the Seventh Circuit

upheld the RFC limiting the claimant to "simple, routine tasks," without further explanation of

how such a limitation adequately accounted for claimant's moderate limitations in concentration,

persistence, or pace, because the ALJ expressly relied on expert testimony that acknowledged

such limitations and proposed the restrictions ultimately adopted by the ALJ. In this case, the ALJ

gave only partial weight to the State Agency psychological consultants' opinions (Tr. 18), and no

other doctor opined restrictions due to Plaintiff's mental limitations. As the ALJ did not rely on

any medical opinion, *Urbanek* is inapplicable here.

Finally, in *Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015), the Seventh Circuit

upheld "simple routine tasks and limited interactions with others" because the evidence supported

the finding that the claimant's limitations in concentration, persistence, and pace stemmed from his

anxiety attacks due to being around others, which was adequately addressed by the social

restrictions. Here, Plaintiff's limitations stem from anxiety, depression, fatigue, hypersomnia, and

pain, all of which affect her ability to concentrate and maintain pace irrespective of limitations on

social interactions. Thus, this case is distinguishable from *Capman*.

Additionally, the RFC is unsupported as it does not account for Plaintiff's use of a service

animal. The Commissioner asserts that the Decision should be upheld because the record

"did not demonstrate that Plaintiff required the use of her [service] dog to perform the range of

work identified by the ALJ in the RFC." This fails for two reasons. First, the justification was not

provided by the ALJ and is, therefore, improper. *See Arnett*, 676 F.3d at 592. Second, the ALJ

failed to explain how she concluded that "the medical record does not provide evidence that the [Plaintiff's] physician prescribed a therapy dog." (Tr. 19.) The ALJ did not cite any evidence in support of that statement, and did not address the evidence that Plaintiff's physicians supported her efforts to obtain a service animal.

Moreover, the ALJ's assessment of Plaintiff's and third-parties' statements was patently wrong given the myopic focus on selective objective evidence, misguided evaluation of Plaintiff's daily activities, failure to consider evidence supporting Plaintiff's statements, and failure to consider the evidence consistent with Agency regulations and applicable precedent. A court may reverse if a decision is not "competently" explained or is grounded in reasons that are not supported by the record, or are otherwise factually or logically mistaken. *Engstrand*, 788 F.3d at 660 (7th Cir. 2015). The Commissioner's reliance on the ALJ's consideration of objective evidence and daily activities is misplaced. The issue is not whether the wrong factors were considered, but rather, the ALJ's application of the factors. Further, the ALJ improperly dismissed the third-party reports because the witnesses were not medically trained.

For all of these reasons, remand is warranted to address the issues raised by Plaintiff regarding the RFC analysis.

Next, Plaintiff argues that the ALJ erred at Step 5. It is the Agency's burden to show that there is other work in significant numbers that the individual can perform. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Plaintiff argues that the ALJ erroneously assessed the need for a service animal and the evidence shows Plaintiff cannot function without it. Plaintiff notes that the VE testified that having a service animal would require an accommodation and Plaintiff thus contends that, since an accommodation was required, the

jobs identified by the ALJ in her decision do not accurately reflect jobs available to Plaintiff.

Plaintiff relies on *Vargas v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), where the Seventh Circuit noted that "in this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." Plaintiff argues that, in light of the ALJ's selective review and wholesale ignoring of the evidence most favorable to the Plaintiff, the VE was not provided with all the relevant functional limitations.

Plaintiff further argues that, even if the ALJ properly crafted the RFC and provided all the restrictions to the VE, the Agency still fails to meet its burden at Step Five. The DOT description for Office Helper includes the temperament factor of "Performing a VARIETY of Duties." U.S. Dep't of Labor, Dictionary of Occupational Titles, DICOT 239.567-010 (G.P.O.), 1991 WL 672232 (4th ed. 1991). "Temperaments . . . are the adaptability requirements made on the worker by specific types of jobs." U.S. Dep't of Labor, *Revised Handbook for Analyzing Jobs* 10–1 (1991). They have been found to be "important to adjustments workers must make for successful job performance." *Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 610, 610 n.24 (E.D. Tex. May 21, 2009) (citing Revised Handbook at 10–1). The Revised Handbook for Analyzing Jobs describes performing a "variety" of duties as "involv[ing] frequent changes of tasks involving different aptitudes, technologies, techniques, procedures, working conditions, physical demands, or degrees of attentiveness without loss of efficiency or composure." Revised Handbook for Analyzing Jobs at 10-2. Thus, this temperament would equate to frequent changes. However, the ALJ limited Plaintiff to only occasional changes. (Tr. 15.) Thus, because of the conflicts in Office Helper, Plaintiff contends that remand is warranted pursuant to SSR 00-4p, 2000 WL 1898704 (Dec. 4. 2000).

Likewise, Cleaner, housekeeping includes the temperament for "Performing REPETITIVE or short-cycle work" and "Working UNDER specific instructions." U.S. Dep't of Labor, Dictionary of Occupational Titles, DICOT 323.687-014 (G.P.O.), 1991 WL 672783 (4th ed. 1991). The Revised Handbook for Analyzing Jobs describes performing repetitive or short-cycle work as "involv[ing] performing a few routine and uninvolved tasks over and over again according to set procedures, sequence, or pace with little opportunity for diversion or interruption." Revised Handbook for Analyzing Jobs at 10-2. Thus, this temperament would equate to production work, which the ALJ stated Plaintiff could not perform. (Tr. 15.) Thus, because of the conflicts in Cleaning, housekeeping, Plaintiff again contends that remand is warranted pursuant to SSR 00-4p.

Finally, Production Inspector includes the temperament for "Making JUDGMENTS and Decisions." U.S. Dep't of Labor, Dictionary of Occupational Titles, DICOT 739.687-102 (G.P.O.), 1991 WL 680198 (4th ed. 1991). The Revised Handbook for Analyzing Jobs describes making judgment and decisions as "involve[ing] solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria, such as the five senses, knowledge, past experiences or factual data." Revised Handbook for Analyzing Jobs at 10-5. However, the ALJ's RFC does not provide for this type of activity. In fact, the RFC is entirely silent as to Plaintiff's judgment making abilities. (Tr. 15); *see also* 20 C.F.R. § 404.1522(b)(1) (basic work activities include "use of judgment"). Plaintiff thus maintains that there is no substantial evidence to support the ALJ's finding with regards to Production Inspector.

In response, the Commissioner argues that Plaintiff did not raise these issues at the hearing, and that the conflicts were not "apparent", somehow rendering the issues moot. However, the burden of proof at Step Five lies with the Agency, and it was the ALJ's burden to resolve any

43

discrepancies between the VE's testimony and the DOT. SSR 00-4p, 2000 WL 1898704 (Dec. 4. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006) ("We will defer to an ALJ's decision [at Step Five] if it is supported by 'substantial evidence,' but here there is an unresolved potential inconsistency in the evidence that should have been resolved.")(citation omitted); *Thompson v. Colvin*, No. 2:14-cv-345-WTL-DKL, 2016 WL 791937, at *3 (S.D. Ind. Mar. 1, 2016).

Plaintiff has demonstrated that the RFC limiting her to "occasional changes" was potentially inconsistent with the job of Office Helper, and that the jobs of Cleaner and Production Inspector were also potentially inconsistent with the RFC. Thus, as in *Prochaska*, where the court held that a "potential inconsistency" between the RFC reaching limitations and DOT reaching requirements for the jobs identified by the VE should have been resolved by the ALJ, here, it was the ALJ's affirmative duty to investigate potential conflicts between the RFC and the jobs identified by the VE. 454 F.3d at 735-36. Moreover, the mere fact that the VE rendered an opinion does not make that opinion dispositive of the issue. The ultimate findings at Step Five rests with the ALJ, not the VE. The finding cannot be shifted to the VE because the ALJ is the finder of fact and must build an accurate and logical bridge from the evidence to her conclusions.

Likewise, it is the ALJ's duty, not Plaintiff's, to ensure that the VE testimony is not based on assumptions or definitions inconsistent with Agency policies. SSR 00-4p, 2000 WL 1898704, at *2. Finally, the ALJ is only entitled to rely on the VE's testimony when that testimony is reasonable. *Cardenas v. Berryhill*, No. 17 cv 8242, 2018 WL 5311899, at *6 (N.D. Ill. Oct. 26, 2018) (citing *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008)) ("[A]n ALJ's affirmative duty extends beyond merely asking the VE whether his testimony is consistent with the DOT; the

44

ALJ also must 'elicit a reasonable explanation for any discrepancy.'").

The Commissioner asserts that there is no conflict, but fails to cite any legal precedent in support of his position. In fact, applicable precedent establishes the conflict. *Keller v. Berryhill,* No. CV 16-5042 (SS), 2017 WL 243142, at *4 (C.D. Cal. Jun. 5, 2017) (in light of the RFC, the ALJ's failure to address and explain the application of the DOT temperament was reversible); *Ryan Patrick A. v. Berryhill*, No. EDCV 17-2526-JPR, 2019 WL 1383800, at *6 (C.D. Cal. Mar. 27, 2019) (temperament to attain precise set limits, tolerances, and standards would conflict with an RFC barring fast-paced or production-quota work). Further, the larger issue is that the occupations' inconsistencies were not addressed. *Pearson v. Colvin*, 810 F.3d 204, 211 (4th Cir. 2015) ("Although we could guess what these occupations require in reality, it is the purview of the ALJ to elicit an explanation from the expert . . . ."). In this case, given (a) the temperament identified and required in the jobs according to the DOT, (b) the ALJ's own restriction to no production work, (c) the RFC's silence as to Plaintiff's judgment making abilities, and (d) the relevant and direct evidence showing Plaintiff's inability to perform at a consistent pace without an unreasonable number and length of rest periods, the ALJ's Step Five analysis is erroneous. *Sara A. v. Saul*, No. 3:19-cv-144, 2019 WL 6606861, at *24 (N.D. Ind. Dec. 5, 2019) (remanding for the conflict between the RFC and the DOT description given the temperament factor).

As he ALJ failed to satisfy her burden under SSR 00-4p, remand is required on these issues also.

<u>Conclusion</u>

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion.

Entered: August 21, 2020.

s/ William C.  Lee
William C. Lee, Judge
United States District Court

46